The next case on the oral argument calendar is, and I hope I'm pronouncing it correctly, Sosibori v. Ashcroft. Sosibori v. Ashcroft. The question today is whether the evidence presented would compel a reasonable fact finder to reach a contrary result to the Board of Immigration Appeals. The Board of Immigration Appeals had summarily affirmed that the evidence presented  immigration judge's decision. The majority of our brief addressed the due process concerns of the affirmance without opinion, and I believe that argument has been foreclosed by Falcone-Karice. So the remaining issue, then, is whether or not this immigration judge erred in denying asylum, and whether or not a reasonable fact finder would be compelled to grant asylum based on the evidence presented at the immigration court. Now, initially, I'd like to point out that the immigration judge found the petitioner credible. All of the exhibits were admitted without objection. Therefore, all of the evidence presented must be considered to be undisputed. The evidence presents a case in which the petitioner, a member of a tribal group, a minority tribal group, was attacked by another tribal group. Her group is known primarily as the Kiseye, and the other tribal group is the Masay. The tribal group that is responsible for the violence is the group from which the president, Moi, of Kenya comes from. The first incident that occurred in this case was the petitioner and family members traveling by car from their region of the country through another portion dominated by the Masay on their way to Nairobi for a funeral. During that trip, while they were in the territory of the Masay, the petitioner and her family members were pulled over, stopped by the other tribal group members. They were questioned rapidly about where they belonged, whether they were members of the opposition party. And there was an attempt to drag the petitioner's sister from the car. The petitioner's sister's husband was driving the car, and he attempted to speed away. The assailants then tried to grab them and threw stones at the car. The petitioner, as she's trying to close the door and lock the car, is struck by a rock injuring her arm and causing blood to flow. They did manage to escape, and upon arriving in Nairobi, the petitioner and her family members went to a police station and reported the incident. Nothing that she testified came of the report. They did make the report, however. After the report was made, the petitioner testified, and this was supported by an affidavit that was also admitted into the evidence without objection. After the report was made, the petitioner began noticing that they were followed. In fact, the following began immediately after the report being made at the police station in Nairobi. As the petitioner and her family are returning, they notice that when they stopped, the followers stopped. When they continued, the followers continued. This increased the petitioner's fear. There were a couple of other incidents that occurred after that that the persecutors or those that she believed to be after her did not identify themselves, and it's difficult really to know for sure who they were. We can only look at the evidence as raising an inference that these incidents are a result of the initial contact and the reporting of the incident. She had another sister who was killed at some point. And it was unfair to me from the record when that happened. Yes, Your Honor. This occurred after the petitioner left Kenya for the United States. She died after. But at one point, they seem to say that she, that the incident actually occurred the same month, but she didn't die until later. Your Honor, my understanding from the record, and I don't have the site to the pages, but my understanding from the record that the incident occurred shortly after she left or did occur after she left because she learned about it through communications while she was already in the United States. She testified that her sister denied dying immediately. She was taken to a hospital, but then she later died from the injuries. I think that this is somewhat a unique asylum case that it appears, you know, I didn't represent the petitioner below, and there wasn't a whole lot of record, but what was put into the record that was brought out at the hearing was found to be very credible. No one challenged what she said. So the question is, is when someone is in an area where there is a pattern in practice of tribal clashes and murders resulting from this, when a person credibly testifies to being halted, attempted to be dragged out of a car, seriously injured, report this, whether or not this indeed is persecution on account of a social group. The automobile situation is the one that's key to your claim that under Elias Zacharias there is a compulsion to find the other way. The others don't really. Somebody broke into an apartment. She doesn't know who it was. Following could have been. But if the automobile incident is the one on which your case stands or falls, isn't it? Your Honor, the automobile incident is the one where it's very clear that she's identified as someone opposed to this group, this Mase group. They stopped her. This is the strongest incident. In fact, finding a past persecution could be found based on those facts. The events that occurred after, the reporting to the police and the subsequent following by another car, those lend credence to the past persecution, and it also lends credence to the well-founded fear of persecution. The I.J. skipped over the automobile situation in about two sentences and said they were stopped, there was an altercation, they escaped, and she sustained a slight injury and almost a so what. That's my impression as well, Your Honor, and I thank you for your observation in that regard. In fact, so what is kind of the way that persons outside of Africa have looked at ethnic clashes for many years. We haven't seen much reporting in the NGO documentation or in the State Department reports, and then all of a sudden we have a genocide in Rwanda resulting in over half a million people being killed in a matter of months, and then persons later saying, well, we didn't really know it was so bad. Some of the articles that were submitted by prior counsel below have photographs of victims and with captions, are we the next Rwanda? There's no question that there was, at that time that the record was created here, a severe problem of ethnic clashes, violence and deaths resulting from those ethnic clashes. Can I ask you more about any connection between the incident in the automobile and their subsequent reporting of this once they get to Nairobi? At least I think it happens, they say in the province afterwards, and I know they're on their way to Nairobi, they reported to the police after the incident. Yes, sir. And the following. That is to say, does she testify specifically, and I've read it and I can go back and look, and I think I remember her saying something, but she thinks that they're being followed and she thinks that the bugging is taking place because they reported the incident in the automobile. That is to say, it's not accidental. It's in reaction to and there's some targeting. Is that right? Yes, sir. The testimony was not very articulate, and actually some of that was fleshed out on cross-examination. It was asked, well, when did this following occur? And she said, as soon as we, immediately after reporting the crime in Nairobi. She says, and they don't like people to report. That's correct. There's some. My understanding of the facts were a little different, and it might matter. They were on their way to this funeral place at the time from Nairobi, right? Yes. She doesn't say they reported it in Nairobi. She said we went straight to the police. So the police post there. And then she says, and from there we were given an escort. So it wasn't simply that they reported it. It's that the police then did something, escorted them, which might have made them visible, right? That's what she said in her testimony. And she repeated again that they had a police escort at some point. This was on page 12 of the transcript that I'm reading from. The reason why it seems to me to matter, it makes it a lot more credible that somebody would have known that they were reported to the police because they were apparently escorted by the police after that. Well, I'm looking at the declaration that accompanied the I-589 originally. There are really three places to look at the testimony of the respondent. There's the direct of the petitioner. There's her direct examination, the cross-examination, and then her declaration attached to the I-589. And she does state that when she reported to the police, the police told her that there had been similar experience of the same type in that area. You know, Your Honor, I think in her declaration she also states that she went to the nearest police post to report the incident. It's not clear exactly where that post was. I thank you for bringing that to my attention. And I have to say it's unclear to me whether they were traveling to Nairobi or from  There are different places saying different things in the transcript. Your Honor, the record as I read it was that the incident occurred on the way to the funeral. Yes, and I understand that. And whether the funeral was in Nairobi or in the Kisii. She said that they were on the way to Nairobi for the funeral. To Nairobi for the funeral? I'm sorry?  Yes, that the funeral was in Nairobi. Well, that is what she says. But then they also later on talk about we had to get to the Kisii territory from Nairobi. Of course, she lived in Nairobi. She didn't live in Nairobi? She actually had worked in Nairobi, but she lived in and she worked in the or she lived from the Kisii region. You had to get through the Maasai region, which is in the Rift Valley, to get to Nairobi. The Rift Valley is the political stronghold of the Maasai and the ruling government party. The State Department, in fact, in its this is Exhibit 5 of the Immigration Court's records. The State Department refers to the violent ethnic clashes in the Rift Valley. And, in fact, President Moy, who is Maasai and from that area, stated that no opposition politician should dare step into the Rift Valley. So it was an area not, you know, where you have ethnic clashes, it's hard to say is this social group or political. It's all pretty much the same thing. But it's an area of terrible conflict resulting in violence and death. The Kisii is a minority group. And this individual was targeted because of that. She reported it and later was followed. I believe, Your Honor, that the record would compel any reasonable fact finder to find that a reasonable, an objectively reasonable fear of persecution exists in this case. In fact, she's already been targeted and injured as a result of that persecution. Thank you very much. You've run over. We'll give you a minute in rebuttal. Thank you, Your Honor. Good morning again, Your Honors. Carol Federighi on behalf of Respondent John Ashcroft. Your Honors, the immigration judge held that Petitioner failed to establish that she was and or would be persecuted in Kenya on account of her membership in the Kisii tribe. This condition was painfully supported by the record and should be sustained. Petitioner testified to several incidents that occurred to her in Kenya in 1995 before she came here. She was questioned at the hearing as to the reason for these incidents, but she admitted that she did not know why they occurred to her or, in most of the cases, even who had allegedly perpetrated the incident. Didn't she know who attacked the car? Yes. That's the one incident where she did know, but the other incidents is the break-in and the following and the bugging of her telephone. She doesn't know who was doing that. But the automobile incident resulted in an injury to her and the breaking of the windows to the car. And the occupants of the car, her family, didn't say who they were because they didn't want to identify themselves by their accent. So they thought they were better off being quiet. Right. So in that case, she does know, or she, based on the accent of the people that were attacking her, she guessed that they were Maasai. But they did not respond when they were questioned as to who they were, and there was no indication that Maasai knew that they were Kisii. So there's no indication that they were attacking the car because of that. I think that's an overstatement that there's no indication that the Maasai knew who they were, is to say the Maasai, according to her testimony, stopped them, asked them who they are. They don't say anything, and then the Maasai start causing trouble. There's a pretty clear inference from that that they know or strongly suspect that they're Kisii, and that's why they're doing this. So there's some indication. Yeah, except that she herself, on page 65 of the administrative record, she testified that she, that the attackers did not know that she and her companions were Kisii. Well, that would be literally true, I guess, but they had a pretty good idea that they weren't Maasai, because a Maasai would have said something, given the approach. That, yes, I understand what Your Honor is saying. The immigration judge did not look at it that way because Petitioner did not, did not assert that, that she knew that the attackers knew that they were not Maasai. She just said that they didn't, that they didn't know that they were Kisii. They didn't, she didn't tell them they were Kisii. I think what you're referring to on page 65 is the following exchange, and it's a classic following of a compound question and then a muttered answer. Question, I'm on page 9, excuse me, line 9 of page 65. I suspect this is what you're referring to. Hold on. Okay. Don't take it away. Line, excuse me, what line? Line 9. Line 9. Question? Yeah. Excuse me, in question. But they didn't know that you were Kisii, did they, because you never told them. Had that, no. Well, they didn't know you were Kisii. You never told them. This is, it's hard to pin that down. Yes, it is a little. And the rest of the testimony seems to me, as it carries with it, a very strong inference by her that she's asking us to draw, that of course they did this because they suspected that they were Kisii. I agree that the testimony is a little, is a little muddled. However, she, it's clear that they didn't know for a fact that they were Kisii and that the police, she did say that when they went to the police right after the incident, the police said that a lot of people had been attacked in that area and people had died. So clearly, as also as Petitioner's Counsel pointed out, there's violence in the Rift Valley, ethnic violence there, and they were just caught in the middle of it basically. As Your Honor's pointed out, she If we know that this is ethnic violence and we know that they asked them, what tribe are you from, and they were saying that Kisii did not support the President and so on, and then they pulled them out, it's not a fair inference that they inferred from their non-answering that they were of the other  Why else would they do it? I don't know, Your Honor. I mean, it was, it was sort of left open in the testimony. The other thing that's very odd about the IJ's opinion is, and Judge Nelson referred to this earlier, the way he recounts the car incident, he leaves out that the car was stoned. I mean, it sounds as if she was at, I gather that people, stoned, s-t-o-n-e-d. She says they were stopped by individuals who made inquiries as to who they were. While they were stopped, she was able to secure safety by closing the interior of the automobile and leaving. And she suffered a slight injury. But he doesn't say that people threw stones at the car, which sounds as if somebody stopped them, you know, talked to them and let them go on, and she sustained an injury in some undefined way, which was never reported. Again, I think that he just forgot it or something. I don't know if he forgot it. He did refer to her injury, which did come from the stoning. So it is implicitly included in that. Again, these incidents go to whether she was persecuted in the past because of her membership in the Kissier tribe. Whether she had a well-founded fear of persecution, that's the second part of the inquiry. And she didn't present any evidence that persecution of Kissier has continued or is occurring in Nairobi or any place that she would be likely to return to. Her family ---- She said she would die if she returned. She did. She made the conclusive allegations that she would die. Her sister was caught up in the same area. She was beaten when she was passing through that same area, and she later died of her injuries in 1995. Since 1995, her family has been living unharmed in Kenya, and there's no evidence of any further ---- I know something about the statutory scheme for the first time that I'm just going to ask you because maybe you know something about it. It's interesting. The statute actually doesn't say in order to be eligible to be a refugee that you have to have both past persecution and a well-founded fear of persecution.  And my understanding of the regs is that they look at the well-founded fear as part of the discretionary question whether to grant asylum, but not as part of the eligibility. Is that right? Have you ever looked at that before? No. It's all part of the eligibility inquiry. Well, how can that be when the statute says that a refugee is somebody who is unable or willing to avail himself of persecution because of persecution or a well-founded fear of persecution? Right. Well, the way the inquiry goes is it doesn't have to be in any particular order, but I'll start with past persecution. Under the regs, an alien can establish eligibility for asylum based solely on past persecution if that past persecution was particularly severe and horrific. So, for example, someone who Stalin had put in the Gulag for several years, you know, Stalin's dead, no more Gulag, could still get asylum because the understanding is he's so traumatized that it would just be so horrific for him to go back. Well, I understand that. I'm just saying that when I started, I've always understood that to be the case. But when I started staring at the statute and then more closely at the regulations, it appears to me that that isn't true. The statute, it certainly isn't true of the statute, and therefore, how could it be true of the regs? And the regs seem to me to concentrate, to look at the well-founded fear and the change in circumstances as a reason for discretionary denial of asylum but not eligibility. I'm not sure what regs have gave you that impression. Well. But it is part of the eligibility inquiry. I know we keep saying this, but I'm not at all sure it's true. It is. If you look at the case law, it's clearly addressed under the eligibility part of the inquiry and not under the discretionary. I agree with you that we've said that over and over again. Yes, we've said that over and over again. And so the case law is clear on that, and I think it's clear in the statute and regulations that that's the appropriate way. It's certainly not clear on the statute. The statute says the opposite, clearly. And that ought to be enough. But I'm not sure. I don't think it's true on the regs either. Anyway, go ahead. I'm just curious whether you'd ever thought about it. No. And if Your Honor wants briefing on that issue, we can certainly submit additional briefing. But in this case, Petitioner testified to a few incidences of mistreatment and violence when she was in Kenya. With regard to all except for one incident, there's no indication the basis for the attacks or the interest in her or who was doing it. The only incident where there is some evidence as to what was going on is the car incident, as Your Honor has pointed out, when the Maasai attacked her car and her companions. But, again, there's very little indication that it was directed at her specifically because of her tribal membership. What about the non-testimonial part of the record? In other words, the country report, for example, would seem to back up her story. And the IJA didn't mention that at all. Is that a factor in how we look at this? Well, he found that his decision was based on the fact that she had not shown causation, that whatever happened to her was because of her tribal membership. So when that's the basis, the country reports are less relevant to that. But the country reports do not indicate that there is systematic targeting of Kisieh in Kenya. But there is specific targeting of Kisieh by Maasai. In other words, what did they say? Deadly attacks and revenge counterattacks occurred frequently between the tribes. So that would certainly support the fact that she's going into Maasai territory with her family. They get attacked and things happen that the IJA doesn't mention. And the country report says, yeah, these things go on. Wouldn't that support that as an intertribal fight? Possibly, Your Honor, but there's no indication that, say, if she stayed in Nairobi, that she would be that anyone has any revenge grudge against her particularly, that she just happened to be in the wrong place at the wrong time in 1995, as with her sister. I mean, I think that's all that happened there. But there's no indication in other places in Kenya that. Her sister doesn't have a problem any longer because she's dead. Is that where we get? Well, yes. Unfortunately, she did die from the violence. But since then, her family has remained unharmed in Kenya, and there's no indication that if the family stays out of the area where there's this violence going on or any sort of similar type of violence, that they remain safe and of no interest to the Maasai. Again, no indication that her family is particularly involved in this. In other words, the notion that they should have to stay out of the area. In other words, they can't go home? Is that what it amounts to? They have to live in Nairobi and can't go visit their relatives? You know, I haven't looked at the geography of Kenya and whether there's another way to get there from Nairobi. If they had enough money to fly, I guess they could rent a helicopter every time they wanted to go home. Your Honor, yes. I mean, that would not be a requirement for somebody. I agree with that. But I'm out of time. Again, I don't believe the immigration judge found that the incident she showed did not establish that she was being targeted for persecution on the basis of her tribal identity. The reason I have a real problem with that was that he didn't seem to understand the nature of the incident, because he didn't understand or he didn't know, he didn't recognize that people were throwing stones at the car. You know, he didn't mention that specifically, but he did state that she was injured, which was a result of the stoning. So clearly he knew that the car had been stoned, and the fact that he did not describe that particular aspect of it I don't think is relevant. I think he fully considered all of the testimony and nevertheless decided it did not enough to show causation. So thank you, Your Honor. Thank you very much. You ran over, but we'll give you a minute. You have either the advantage or the disadvantage this morning that we have a late calendar, so I'm not enforcing times very strictly. Thank you, Your Honor. The police report, the death of the sister, the subsequent falling in the car, bring this out of any characterization of something random happening. I think that what the immigration judge, where he might have gone wrong here, is thinking that they're just, you know, maybe the judge demanded that the persecutor write a note, we are Maasai, we are persecuting you because you're a QCA. But we just can't expect a persecutor to do that. It's hard for us to put our heads into the minds of the people of these tribes, but they know each other, they can see each other, they can tell from the accents. So we don't need to have a fact pattern where the Maasai pulls over their car and says, okay, we identify you as being our enemy. It's not going to happen. What they do instead is they pull over the car, they start shouting out, who are you from, where are you here, what part are you with, and they start dragging them out of the car. That's how, in reality, something like this takes place. Now, if that wasn't enough, the petitioner and her family actually increased their risk of a repeat of this kind of behavior by reporting it to the police. So under the asylum law, I'm glad that we do not have to rely only on withholding of removal, because under the asylum law, all we have to show is that this individual has a reasonable basis for fearing to return to that country. After the death of her sister, after the beating or the stoning in the car, and the well-known country circumstances, she has a reasonable, objective fear of returning to her country. And on that, I rest and I thank the Court for indulging me. I thank both of you for your useful arguments. The case of Bosse-Borre v. Ashcroft is now submitted for decision. The next case on the calendar is Navarette v. Ashcroft. That case has been submitted on the briefs. The last case on the argument calendar is, I'm not sure how to pronounce it, Conawayer v. Barnhart.
judges: Tg Nelson, W. Fletcher, Berzon